UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CellTrust Corporation, | Case No. 19-cv-2855 (WMW/TNL) |
| Plaintiff, | |
| | **ORDER** |
| v. | |
| ionLake, LLC; Derrick Girard; and Wade Girard, | |
| Defendants. | |

In this patent-infringement action, Plaintiff alleges that Defendants make, use and sell a product and service that infringes two United States patents owned by Plaintiff. This matter is now before the Court to construe thirteen disputed claim terms in Plaintiff's asserted patents. In addition, the parties cross-move for summary judgment and to exclude expert testimony. For the reasons addressed below, the Court construes the disputed claim terms as addressed herein, grants in part and denies in part Plaintiff's motion for summary judgment, denies Defendants' motion for summary judgment, grants in part and denies in part Plaintiff's motion to exclude expert testimony, and denies Defendants' motion to exclude expert testimony.

## BACKGROUND

Plaintiff CellTrust Corporation (CellTrust) is an Arizona corporation that provides mobile communications products and services for regulated industries, including the financial industry. CellTrust owns United States Patent No. 9,775,012 (the '012 Patent)

and United States Patent No. 10,778,837 (the '837 Patent) (collectively, the CellTrust Patents), both of which are titled "System and Method for Tracking SMS Messages." The CellTrust Patents describe and claim a system and method for tracking communications conveyed using mobile devices. One stated purpose of the inventions claimed in the CellTrust Patents is to provide a system and method that allows an organization to track or archive communications between the organization's employees and its customers to satisfy audit and compliance requirements.

Defendant ionLake, LLC, is a Minnesota limited liability company and Defendants Derrick Girard and Wade Girard are ionLake's governing members.[1] It is undisputed that ionLake provides a service called MyRepChat, which permits users to track text message communications between a telephone and a virtual number associated with a mobile application.

CellTrust commenced this action in November 2019. Counts I and II of the second amended complaint allege that ionLake has directly or indirectly infringed multiple claims in the '012 Patent and the '837 Patent, respectively, by making, using, offering for sale or selling the MyRepChat product or service. Counts III and IV of the second amended complaint allege that Derrick Girard aided and abetted the infringement of the '012 Patent and the '837 Patent, respectively. Count V of the second amended complaint alleges that Wade Girard aided and abetted the infringement of the '012 Patent.

---

[1]    For ease of reference, the Court will refer to Defendants collectively as either "Defendants" or "ionLake" unless otherwise indicated.

Both ionLake and Derrick Girard assert counterclaims seeking declaratory judgment of noninfringement and invalidity as to the CellTrust Patents.

The parties dispute thirteen claim terms in the CellTrust Patents—seven terms that appear in the '012 Patent and six terms that appear in the '837 Patent.  The parties also cross-move for summary judgment as to the invalidity of the CellTrust Patents and cross-move to exclude expert testimony.

## ANALYSIS

### I.      Claim Construction

Whoever "without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . during the term of the patent," infringes that patent.  35 U.S.C. § 271(a).  A district court employs a two-step analysis when making a patent-infringement determination.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995).  First, the district court construes the asserted claims of the patent to ascertain their meaning and scope.  *Id.*  Second, the fact finder compares the construed claims to the accused product.  *Id.*

At the claim-construction stage, the district court must resolve any dispute about claim scope raised by the parties, because "the ultimate question of construction [is] a legal question."  *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) (quoting *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 1574 U.S. 318, 333 (2015)).  A district court construes the disputed claims "independent of the accused product, in light of the specification, the prosecution history, and the prior art."

*Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (internal quotation marks omitted).  Although a district court may consider the accused device when determining *which* aspects of the patent claim should be construed, the claim "is construed in . . . light of the claim language . . . *not* in light of the accused device." *Exigent Tech., Inc. v. Atrana Sols., Inc.*, 442 F.3d 1301, 1309 n.10 (Fed. Cir. 2006) (internal quotation marks omitted).  Claim construction merely elaborates the typically terse language of patent claims "to understand and explain, but not to change, the scope of the claims." *Embrex*, 216 F.3d at 1347 (internal quotation marks omitted).

To ascertain the meaning of disputed patent claim terms, a district court begins its analysis by focusing on the words of the claims.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005).  "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Id.* (internal quotation marks omitted).  Courts generally give words in a patent claim their ordinary and customary meaning.  *Id.*  The ordinary and customary meaning of a claim term is the meaning that would be understood by a person of ordinary skill in the field of technology in question at the time of the invention:

> Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field.  The inventor's words that are used to describe the invention—the inventor's lexicography—must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology.

*Id.* at 1313 (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)).

The ordinary meaning of claim language "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. For this reason, a district court need not construe terms that have ordinary meanings, "lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). Also, to be legally sound, a "claim construction need not . . . purge every shred of ambiguity." *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007). "The resolution of some line-drawing problems—especially easy ones" is a determination "properly left to the trier of fact." *Id.*

A district court begins the process of claim construction by reviewing the patent's specification and prosecution history. *Phillips*, 415 F.3d at 1313. The specification, which includes the written description of the invention, "is the single best guide to the meaning of a disputed term." *Id.* at 1315 (internal quotation marks omitted). When the specification includes "a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," the lexicography of the inventor governs. *Id.* at 1316. But a district court may not import limitations from the written description into the claims. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998). The disclosure of a particular embodiment of the claimed invention in the

specification does not narrow the patent claims. *Id.* at 1347–48. Moreover, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) (internal quotation marks omitted). Although the patent's prosecution history may be used to understand the claim terms, it cannot enlarge, diminish or vary the claim limitations. *Markman*, 52 F.3d at 980. Extrinsic evidence may be consulted when it is useful in determining the true meaning of disputed claim language, but it is less significant than the intrinsic record. *Phillips*, 415 F.3d at 1317; *Markman*, 52 F.3d at 980–81. And it is error to use extrinsic evidence to vary or contradict the terms of the claims. *Markman*, 52 F.3d at 981.

### A. Disputed Claim Terms in the '012 Patent

The parties disagree as to the proper construction of seven claim terms or phrases that appear in the '012 Patent. The Court addresses each dispute in turn.

### 1. "electronic discovery"

| CellTrust's Construction | ionLake's Construction |
|---|---|
| The discovery of electronically stored information (ESI) to meet the mandates imposed by requirements for civil or criminal litigation, regulatory oversight, or administrative proceedings. | The electronic aspect of collecting or producing electronically stored information. |

The parties dispute the meaning of the term "electronic discovery," which appears in asserted claims 1, 7, 13, 20 and 23 of the '012 Patent.

To ascertain the meaning of disputed patent claim terms, the Court begins its analysis by focusing on the words of the claims. *Phillips*, 415 F.3d at 1312. Viewed in context, claim 1 of the '012 Patent includes the following representative example of the disputed "electronic discovery" term:

> . . . wherein the electronic-discovery system is configured for at least one of preserving, searching, reviewing and producing communications for **electronic discovery**.

(Emphasis added.) The plain language of this claim limitation suggests that "electronic discovery," which is preceded by the word "for," describes the *purpose* of "preserving, searching, reviewing and producing communications." *See* Merriam-Webster's Collegiate Dictionary 488 (11th ed. 2014) (defining "for" as a word "used as a function word to indicate purpose"). This interpretation is consistent with the general principles of claim construction, because claim terms should be construed in a manner consistent with the "clear purpose of the invention." *Cordis Corp. v. Medtronic Ave., Inc.*, 511 F.3d 1157, 1179 (Fed. Cir. 2008); *accord CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1160 (Fed. Cir. 1997) ("In construing claims, the problem the inventor was attempting to solve . . . is a relevant consideration."). As such, the most reasonable construction of "electronic discovery" should reflect the invention's purpose for preserving, searching, reviewing and producing communications.

The '012 Patent's specification describes the problem the inventor was attempting to solve, observing that "compliancy, reporting and auditing have become major requirements for many vertical industries" and "[p]resent systems and methods for SMS

communications . . . are inadequate to meet these requirements."   Similarly, the

'012 Patent's prosecution history includes CellTrust's response to an office action from

the United States Patent and Trademark Office (USPTO), in which CellTrust described

"electronic discovery" as follows:

> Electronic discovery (which is also sometimes known as e-discovery, ediscovery, eDiscovery, or e-Discovery) is the electronic aspect of identifying, collecting and producing electronically stored information (ESI) in response to a request for production in a litigation or investigation.[2]

As such, the specification and prosecution history of the '012 Patent establish that the

invention's purpose for preserving, searching, reviewing and producing communications

is to improve preexisting methods of satisfying compliance, reporting and auditing

requirements, including the process of responding to requests for production in the

context of litigation or an investigation.

A correct claim construction "stays true to the claim language and most naturally

aligns with the patent's description of the invention."  *Phillips*, 415 F.3d at 1316 (internal

quotation marks omitted).   Here, CellTrust's proposed construction of "electronic

discovery" is consistent with the invention's purpose for preserving, searching, reviewing

and producing communications, as CellTrust defines "electronic discovery" to include

"meet[ing] the mandates imposed by requirements for civil or criminal litigation,

regulatory oversight, or administrative proceedings."   By contrast, ionLake's proposed

---

[2]     Defendants also rely on this evidence to support their proposed construction.  But in doing so they selectively quote this statement out of context, removing the most crucial aspect of the definition—namely, that electronic discovery pertains to the process of responding to requests for production in litigation or an investigation.

construction of "electronic discovery" does not describe the purpose of "preserving, searching, reviewing and producing communications." Because it fails to describe a purpose, ionLake's proposed construction of "electronic discovery" improperly renders the word "for" in the claim limitation meaningless. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."). Moreover, ionLake's proposed construction renders the claim limitation redundant and nonsensical, because it would essentially result in the claim limitation meaning "preserving, searching, reviewing and producing communications for [the purpose of] collecting or producing electronically stored information."

For these reasons, the Court rejects ionLake's proposed construction of "electronic discovery" and adopts CellTrust's proposed construction of "electronic discovery"— namely, "[t]he discovery of electronically stored information (ESI) to meet the mandates imposed by requirements for civil or criminal litigation, regulatory oversight, or administrative proceedings."

2.   "electronic-discovery system"

| CellTrust's Construction | ionLake's Construction |
|---|---|
| A system for performing electronic discovery. | A computer system configured for at least one of preserving, searching, reviewing, and producing electronically stored information. |

The parties dispute the meaning of the term "electronic-discovery system," which appears in asserted claims 1, 5, 7, 11, 13, 20 and 23 of the '012 Patent.  The '012 Patent includes the following representative examples of this disputed term:

> [Claim 1]
> . . . sending the communication to an **electronic-discovery system**, wherein the **electronic-discovery system** is configured for at least one of preserving, searching, reviewing and producing communications for electronic discovery.
>
> . . .
>
> [Claim 5]
> The method of claim **1** wherein the **electronic-discovery system** comprises an email archiving system and sending the communication to the **electronic-discovery system** comprises sending the communication as part of the body of an email or as an attachment to an email.

(Emphasis added.)  The disputed claim term "electronic-discovery system" comprises "electronic discovery," which the Court construed in Part I.A.1. of this Order, used as a phrasal adjective to modify the word "system."

Some claim terms are simple enough that a lay person can understand the term's meaning.  *Phillips*, 415 F.3d at 1314.  As such, a district court need not construe terms that have ordinary meanings.  *O2 Micro*, 521 F.3d at 1360.  And "claim construction need not always purge every shred of ambiguity," because "resolution of some line-drawing problems . . . is properly left to the trier of fact."  *Acumed LLC*, 483 F.3d at 806.  Here, nothing in the claim language or specification of the '012 Patent reflects that the word "system" has a specialized or technical meaning in the relevant art that deviates from the commonly understood meaning of this word.  The '012 Patent, together with the

Court's construction of "electronic discovery," provides sufficient context from which the term "electronic-discovery system" can be understood by a lay juror.

The parties' proposed constructions demonstrate why no construction is necessary. CellTrust's proposed construction, "[a] system for performing electronic discovery," essentially re-orders the words in the disputed claim term and does not identify or resolve an ambiguity or otherwise assist a lay juror's understanding of the claim term. And ionLake's proposed construction, "[a] computer system configured for at least one of preserving, searching, reviewing, and producing electronically stored information," is similarly unhelpful because it merely repeats language that already appears in the claim limitation. At best, ionLake's proposed construction is redundant. Moreover, the fact that an "electronic-discovery system" involves a *computer* system will be clear to a lay juror based on context.

For these reasons, the Court rejects both parties' proposed constructions of "electronic-discovery system" because this disputed claim term has a plain and ordinary meaning that requires no construction.

### 3.   "email archiving system"

| CellTrust's Construction | ionLake's Construction |
|---|---|
| A system for saving and protecting the data contained in email messages to enable fast retrieval for aiding with compliance, knowledge management, litigation support, and storage management of emails. | A computer system that receives and stores emails. |

The parties dispute the meaning of the term "email archiving system," which appears in asserted claims 5 and 11 of the '012 Patent.  This disputed term appears twice in the '012 Patent, as reflected in this representative example:

> . . . wherein the electronic-discovery system comprises an **email archiving system** and sending the communication to the electronic-discovery system comprises sending the communication as part of the body of an email or as an attachment to an email.

(Emphasis added.)   CellTrust contends that an "email archiving system" should be narrowly construed, whereas ionLake proposes a broad construction.

In support of its proposed construction, CellTrust relies on the specification of the '012 Patent, which provides that "[m]ost companies use email archiving systems such as HP Autonomy, Global Relay, ArcMail, IBM Content Collector, Smarsh or Symantec Enterprise Vault."  But the specification does not suggest that these examples define the universe of *all* email archiving systems.   Moreover, a district court "may not import limitations from the written description into the claims," and the disclosure of a particular embodiment of the claimed invention in the specification does not narrow the patent claims.  *Laitram Corp.*, 163 F.3d at 1347–49.  The fact that the specification of the '012 Patent provides examples of email archiving systems used by "[m]ost companies" cannot narrow the scope of the claim term "email archiving system."

Even if an "email archiving system" were limited to systems akin to the examples listed in the specification, these examples do not support CellTrust's proposed construction.  The specification does not describe the features or functionality of any

particular email archiving system.  Notably, nothing in the specification suggests that an email archiving system must "enable fast retrieval," let alone do so for purposes such as "knowledge management" or "storage management."  As such, CellTrust's proposed construction improperly narrows the scope of the term "email archiving system" in a manner that is not supported by the claim language or the specification.

By contrast, ionLake's proposed construction—"[a] computer system that receives and stores emails"—is consistent with the plain and ordinary meaning of "email archiving system" and the use of that term in both the claim language and the specification.  CellTrust counters that ionLake's proposed construction is "overly broad." But the claim language is broad, and CellTrust identifies nothing in the '012 Patent that defines "email archiving system" more narrowly.  CellTrust correctly contends that the purpose and function of an email archiving system are relevant considerations.  However, the purpose and function of the email archiving system are reflected in the claim language's description of the "email archiving system" as being part of an "electronic-discovery system."  Narrowing the construction of "email archiving system" any further is not supported by the intrinsic evidence.

For these reasons, the Court rejects CellTrust's proposed construction of "email archiving system" and adopts ionLake's proposed construction of "email archiving system"—namely, "[a] computer system that receives and stores emails."

### 4.    "mobile application"

| CellTrust's Construction | ionLake's Construction |
|---|---|
| A mobile application, most commonly referred to as an app, is a type of application software designed to run on a mobile device, such as a smartphone or tablet computer. | A computer program or application for any device configured for transmitting and receiving electronic communications. |

The parties dispute the meaning of the term "mobile application," which appears in asserted claim 13 of the '012 Patent as follows:

> . . . wherein the communication is between the server and one of a telephone communicating via a virtual number and a mobile device having a **mobile application** that is associated with the virtual number.

(Emphasis added.)

A district court must focus first on the words of the claims. *Phillips*, 415 F.3d at 1312. Here, the claim language limits "mobile application" in only two ways—first, a mobile application must be part of a "mobile device," and second, a mobile application must be "associated with [a] virtual number."[3] When the specification includes a special definition given to a claim term by the patentee that differs from the term's ordinary meaning, the lexicography of the inventor governs. *Id.* at 1316. The specification of the '012 Patent does not define "mobile application," but the specification defines "mobile device" as "any device configured for transmitting and receiving electronic communications" and provides examples of such devices. Thus, a "mobile application"

---

[3]    In their joint claim construction statement, the parties agree that a "virtual number" is "[a] telephone number that is not locked down to a specific phone and can route a voice call or text message to any phone or workflow."

must be associated with a virtual number and must be part of "any device configured for transmitting and receiving electronic communications."

The construction proposed by ionLake—"[a] computer program or application for any device configured for transmitting and receiving electronic communications"—is consistent with the claim language and specification.[4]  CellTrust argues that ionLake's proposed construction is too broad because it does not limit "mobile applications" to handheld devices such as smartphones or tablet computers that contain "a SIM card with a true phone number assigned to it by a mobile carrier so that it can communicate via a mobile carrier network."   But CellTrust's argument ignores the '012 Patent's broad definition of "mobile device," which is *not* limited to handheld devices containing a SIM card and, to the contrary, expressly includes devices such as a "desktop computer."   The patentee's definition displaces any conflicting ordinary meaning that might otherwise apply.  *Id.*  CellTrust's arguments to the contrary lack merit.

CellTrust contends that a "mobile application" must be limited to applications that run on devices that have "the capability to communicate with a mobile carrier network," citing examples from the specification.  But the disclosure of a particular embodiment of the claimed invention in the specification does not narrow the patent claims.[5]  *Laitram Corp.*, 163 F.3d at 1347–49.  Neither the claim language nor the specification's definition

---

[4]     The parties appear to agree that an "application" in this context is computer program or software.  The claim language and specification support this construction.

[5]     In fact, the specification of the '012 Patent expressly provides that "other embodiments may be realized" and "the detailed description herein is presented for purposes of illustration only and not of limitation."

of "mobile device" *requires* a mobile application to have the ability to communicate with a mobile carrier network.  Indeed, the specification provides:

> In *most* embodiments the communication gateway sends the message to a carrier.  The carrier *can use* a mobile network to transmit the message between the communication gateway and mobile device.

(Emphasis added.)  Although *most* embodiments of the invention *can use* a mobile carrier network, this language does not suggest that communication with a mobile carrier network is necessary in *every* embodiment.  To the contrary, the specification provides:

> In some embodiments, information that is communicated through mobile telephone network **40** may also, or instead, be communicated through a traditional phone network, for example, that provides direct wired phone service for a number of users.

Moreover, the specification broadly defines a "mobile phone network" to include "a cellular network, a satellite network, a WiFi network, a WiMAX network, a wireless network, or any other suitable network for transmission of information to mobile phones and/or other mobile devices."   These aspects of the specification contradict the limitations CellTrust seeks to impose on the construction of the claim term "mobile application."

For these reasons, the Court rejects CellTrust's proposed construction of "mobile application" and adopts ionLake's proposed construction of "mobile application"—namely, "[a] computer program or application for any device configured for transmitting and receiving electronic communications."

5.      "server"

| CellTrust's Construction | ionLake's Construction |
|---|---|
| One or more computers, devices, or programs that are dedicated to managing network resources and "serve" other computers, devices, or programs called "clients" to which the server provides one or more functionalities. | A networked computer that manages access to a computer resource or service. |

The parties dispute the meaning of the term "server," which appears repeatedly in asserted claims 1, 7, 13, 20 and 23 of the '012 Patent.

When a patent's specification includes "a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," the lexicography of the inventor governs. *Phillips*, 415 F.3d at 1316.  Otherwise, courts generally give words in a patent claim their ordinary and customary meaning. *Id.* at 1312–13.  Here, nothing in the claim language or the specification of the '012 Patent reflects that "server" has a specialized or technical meaning that deviates from the commonly understood meaning of this term in the context of computer and information technology.   And the parties have not identified any other evidence to suggest a specialized meaning.  Thus, the Court may rely on the ordinary meaning and usage of the term, which reflects that a "server" in this context commonly is understood to mean "a computer in a network that is used to provide services (as access to files or shared peripherals or the routing of e-mail) to other computers in the network." *See* Merriam-Webster's Collegiate Dictionary 1137 (11th ed. 2014).

Both parties propose constructions that generally are consistent with the commonly understood meaning of "server" in this context. However, the correct claim construction typically is the construction that "stays true to the claim language and most naturally aligns with the patent's description of the invention." *Phillips*, 415 F.3d at 1316 (internal quotation marks omitted). Claim construction "is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Embrex*, 216 F.3d at 1347 (internal quotation marks and brackets omitted). As such, a proper claim construction is one that will help a jury to understand the meaning of the claims. *See Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004). The Court must, therefore, determine which of the two proposed constructions most naturally aligns with the patent's description of the invention and will be helpful to a jury by explaining, without changing, the scope of the claims.

CellTrust contends that ionLake's proposed construction is "overly narrow" because it does not include certain server functionalities described in the specification. CellTrust correctly observes that the specification of the '012 Patent describes numerous server functionalities:

> Server **15** may provide any desired functionality to system **100**, for example managing client software installed on one or more mobile devices, updating client software installed on one or more mobile devices, issuing commands to client software, tracking messages sent and received by client software, and the like. Server **15** may also manage encryption keys for client software, generate new encryption keys, communicate with a hardware security module . . . and

provide resiliency to increase the reliability of message delivery.

But CellTrust does not plausibly explain why ionLake's proposed construction is too narrow to include these functionalities. Under ionLake's proposed construction, a server "manages access to a computer resource or service." And each of the functionalities described in the foregoing passage from the specification involves managing access to a computer resource or service.

By contrast, CellTrust's proposed construction adds numerous additional terms and complexity to the definition of "server." Rather than assisting a jury to understand the meaning of "server," CellTrust's proposed construction is at best unnecessary, and it could create confusion. Despite its additional length and complexity, CellTrust's proposed construction provides little, if any, elaboration on what "functionalities" a server may possess as compared to ionLake's proposed construction.

In summary, although both parties propose a construction that is consistent with the commonly understood meaning of "server," CellTrust's proposed construction likely would not assist a lay juror and could create confusion, whereas ionLake's proposed construction is simple and clear without being overly narrow. For these reasons, the Court rejects CellTrust's proposed construction of "server" and adopts ionLake's proposed construction of "server"—namely, "[a] networked computer that manages access to a computer resource or service."

###### 6.     "mobile application that is associated with the virtual number"

| CellTrust's Construction | ionLake's Construction |
|---|---|
| Application software designed to run on a mobile device, such as a smartphone or tablet computer that is connected or linked with a virtual phone number. | A virtual number linked with a computer program or application for any device configured for transmitting and receiving electronic communications. |

The parties dispute the meaning of the phrase "mobile application that is associated with the virtual number," which appears in asserted claim 13 of the '012 Patent as follows:

> . . . wherein the communication is between the server and one of a telephone communicating via a virtual number and a mobile device having a **mobile application that is associated with the virtual number**.

(Emphasis added.)

This disputed phrase comprises the term "mobile application," which must be "associated with" a "virtual number."  The term "mobile application" is construed in Part I.A.4. of this Order consistent with ionLake's proposed construction.  And the parties agree that a "virtual number" is "[a] telephone number that is not locked down to a specific phone and can route a voice call or text message to any phone or workflow."  As such, the only remaining dispute to resolve is the meaning of "associated with."

The only apparent difference between the parties' proposed constructions of the words "associated with" is that ionLake's proposed construction uses "linked with" whereas CellTrust's proposed construction uses "connected or linked with."  CellTrust has not identified a meaningful difference between "connected" and "linked," which are

essentially synonymous. *Compare* Merriam-Webster's Collegiate Dictionary 264 (11th ed. 2014) (defining "connected" as "joined or linked together") *with* Merriam-Webster's Collegiate Dictionary 724 (11th ed. 2014) (defining "link" as "to couple or connect"). As such, CellTrust's use of both terms in its proposed construction is redundant.

For these reasons, the Court rejects CellTrust's proposed construction of this disputed phrase and adopts ionLake's proposed construction of this phrase—namely, "[a] virtual number linked with a computer program or application for any device configured for transmitting and receiving electronic communications."

   7. **"wherein the electronic-discovery system is configured for at least one of preserving, searching, reviewing and producing communications for electronic discovery"**

| CellTrust's Construction | ionLake's Construction |
|---|---|
| The electronic discovery system has been designed or combined with other elements to be able to perform at least one of the following functionalities in the context of electronic discovery: preserving, searching, reviewing, or producing. | The step of arranging or ordering the electronic-discovery system for at least one of preserving, searching, reviewing and producing electronically stored information. |

The parties dispute the meaning of the phrase "wherein the electronic-discovery system is configured for at least one of preserving, searching, reviewing and producing communications for electronic discovery," variations of which appear in asserted claims 1, 7, 13, 20 and 23 of the '012 Patent. Viewed in context, the '012 Patent includes the following representative example of this disputed phrase:

[Claim 1]
. . . at the server, sending the communication to an electronic-discovery system, **wherein the electronic-discovery system is configured for at least one of preserving, searching, reviewing and producing communications for electronic discovery**.

(Emphasis added.)

As to this phrase, the parties primarily dispute whether the "configured for" language should be construed as a verb or a past participle adjective. The construction proposed by ionLake treats "configured for" as a verb, which means that an individual practicing the patented method must perform the step of configuring the electronic-discovery system to preserve, search, review or produce communications for electronic discovery. By contrast, CellTrust's proposed construction treats "configured for" as a past participle adjective, which means that the electronic-discovery system merely needs to possess the characteristic of having been previously configured to be capable of performing one of these functions.

The word "configured" is the past participle form of the verb "configure," which is commonly understood to mean "to set up for operation . . . in a particular way." *See* Merriam-Webster's Collegiate Dictionary 261 (11th ed. 2014). A past participle has "the characteristics of both verb and adjective" and "typically expresses completed action." *Id.* at 903, 907. Consistent with these rules of grammar, the use of a past participle in a claim limitation typically describes an object with a preexisting characteristic. *See, e.g.*, *Donghee Am., Inc. v. Plastic Omnium Advanced Innovation & Rsch.*, 812 F. App'x 988, 991 (Fed. Cir. 2020) (observing that "the term 'stake-fastened' " is "the past participle of

'stake-fasten' " and "describes an accessory that has already been fastened to the tank wall"); *Tuna Processors, Inc. v. Haw. Int'l Seafood, Inc.*, 327 F. App'x 204, 209 (Fed. Cir. 2009) (holding that the use of a past participle in the claim language "the produced smoke" describes smoke that has already been produced). Application of these principles to the relevant claim language in the '012 Patent supports CellTrust's proposed construction and contradicts ionLake's proposed construction.

CellTrust's proposed construction also is consistent with the specification of the '012 Patent. The specification describes electronic-discovery systems that have already been configured to preserve, search, review or produce communications for electronic discovery: "Most companies use email archiving systems . . . [that] are typically used for eDiscovery and are capable of archiving email communication within the enterprise." By contrast, ionLake has identified nothing in the specification suggesting that configuring an electronic-discovery system is a step of the patented method that must be performed.

For these reasons, the Court rejects ionLake's proposed construction of this disputed phrase and adopts CellTrust's proposed construction of this phrase—namely, "[t]he electronic discovery system has been designed or combined with other elements to be able to perform at least one of the following functionalities in the context of electronic discovery: preserving, searching, reviewing, or producing."

### B. Disputed Claim Terms in the '837 Patent

The parties also disagree as to the proper construction of six claim terms or phrases that appear in the '837 Patent. The Court addresses each dispute in turn.

### 1.     "a subscriber"

| CellTrust's Construction | ionLake's Construction |
|---|---|
| A person who pays to, or is licensed to, receive a service. | A user. |

The parties dispute the meaning of the term "a subscriber," which appears in asserted claims 1, 11 and 20 of the '837 Patent.  Claim 1 of the '837 Patent provides a representative example of this disputed term in context:

> **1.** A method for tracking electronic communications for **a subscriber**, the method comprising:
> associating **a subscriber** business number with **a subscriber** software module configured to run on **a subscriber** mobile device; . . . .

(Emphasis added.)   Whereas ionLake proposes construing "a subscriber" broadly, CellTrust proposes a narrower construction.  Although ionLake's proposed construction is broader than the commonly understood meaning of "subscriber," ionLake contends that "[t]he term 'subscriber' as used in the specification is simply a user" of the patented invention.

When a patent's specification includes "a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," the lexicography of the inventor governs.  *Phillips*, 415 F.3d at 1316.  The specification of the '837 Patent describes the patented method as follows:

> The following examples help to explain the use of the system and method of the present invention.
>
> The ABC agency deploys the secure mobile application **201** to *its users (i.e., subscribers)* then disables all other messaging applications including SMS.  Each *user* is

> provided a virtual phone number **302**.  In some cases, the *users* may have one or more virtual numbers **302**, for example since they are working in Canada or the UK.  The *users (i.e., employees or agents of ABC company)* use the various embodiments of the invention to communicate with ABC company customers that are not using the secure mobile application . . . .  These customers dial the *subscribers'* virtual numbers, which routes the call to the native cell number of the phones registered to the secure mobile application **201**.

(Emphasis added.)

The foregoing passage from the specification supports two notable inferences.  First, by referring to "users (i.e., subscribers)," the specification expressly defines these terms as interchangeable.  "The usage 'i.e.' ('*id est*' or 'that is'), signals an intent to define the word to which it refers."  *TF3 Ltd. v. Tre Milano, LLC*, 894 F.3d 1366, 1372 (Fed. Cir. 2018) (internal quotation marks omitted); *accord SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1202 (Fed. Cir. 2013) (holding that "i.e." is definitional when it "comports with the inventors' other uses . . . in the specification and with each and every other reference").  Second, the specification repeatedly uses the terms "subscriber" and "user" interchangeably.  And the specification does not describe an embodiment of the invention that would be excluded if "subscriber" and "user" are deemed to be synonymous.  For these reasons, the intrinsic evidence demonstrates the inventor's intent to define "subscriber" as synonymous with "user."

By contrast, CellTrust proposes to more narrowly construe "a subscriber" to mean "[a] person who pays to, or is licensed to, receive a service."  But nothing in the claim language or specification of the '837 Patent suggests that a payment or license is required

to be a subscriber.  Indeed, the words "pay" and "license" are not referenced anywhere in the '837 Patent, and CellTrust has not identified anything in the '837 Patent from which these limitations can be reasonably inferred.  As such, CellTrust's proposed construction is unreasonably narrow.

For these reasons, the Court rejects CellTrust's proposed construction of the term "a subscriber" and adopts ionLake's proposed construction—namely, "[a] user."

2.      "subscriber business number"

| CellTrust's Construction | ionLake's Construction |
|---|---|
| A phone number used by a subscriber (as defined above) for business purposes. | A phone number for a user. |

The parties dispute the meaning of the term "subscriber business number," which appears in asserted claims 1, 4, 8, 11, 14, 18, 20 and 23 of the '837 Patent.  Claim 1 of the '837 Patent provides a representative example of this disputed term in context:

> **1.** A method for tracking electronic communications for a subscriber, the method comprising:
> associating a **subscriber business number** with a subscriber software module configured to run on a subscriber mobile device; . . . .

(Emphasis added.)

The only differences between the parties' proposed constructions of "subscriber business number" pertain to the construction of "subscriber" and CellTrust's addition of the phrase "for business purposes" in its proposed construction.  The construction of "subscriber" has been resolved in Part I.B.2. of this Order in favor of ionLake.  As such,

the only remaining dispute is whether the phrase "for business purposes" should be included in the construction of "subscriber business number."

"A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so." *Merck*, 395 F.3d at 1372. Here, the parties agree that a "subscriber business number" refers to a phone number. But the claim language uses the word "business" to modify the word "number." Adopting ionLake's proposed construction would give no meaning to the claim term "business." By contrast, CellTrust's use of the phrase "for business purposes" is consistent with the claim language, gives meaning to all of the terms, and connects the term "business" to the term "number" in a meaningful way.

The specification of the '837 Patent also confirms that a "subscriber business number" is a phone number used for business purposes. The specification refers to a company's "users (i.e., subscribers)" as the "employees or agents of" the company, and explains that those employees "use the various embodiments of the invention to communicate with . . . company customers." Moreover, when "construing claims, the problem the inventor was attempting to solve, as discerned from the specification and the prosecution history, is a relevant consideration." *CVI/Beta Ventures*, 112 F.3d at 1160. Here, when describing the problem the inventor was attempting to solve, the '837 Patent observes that "SMS is now used for business communication" and "such business use presents a number of challenges," including the "compliancy, reporting and auditing [that] have become major requirements for many vertical industries, such as finance,

government and healthcare businesses." This intrinsic evidence demonstrates that "subscriber business number" means a phone number used for business purposes.

For these reasons, the Court rejects ionLake's proposed construction of the term "subscriber business number" and adopts CellTrust's proposed construction of this term, as modified to be consistent with the Court's construction of the claim term "a subscriber"—namely, "[a] phone number used by a subscriber (i.e., a user) for business purposes."

### 3.   "subscriber software module"

| CellTrust's Construction | ionLake's Construction |
|---|---|
| A software component or part of a program that contains one or more routines used by a person who pays to, or is licensed to, receive a service. | A computer program or application for a user. |

The parties dispute the meaning of the term "subscriber software module," which appears in asserted claims 1, 4, 11 and 20 of the '837 Patent. Claim 1 of the '837 Patent provides a representative example of this disputed term in context:

> **1.** A method for tracking electronic communications for a subscriber, the method comprising:
> associating a subscriber business number with a **subscriber software module** configured to run on a subscriber mobile device; . . . .

(Emphasis added.)

The primary difference between the parties' proposed constructions of "subscriber software module" pertain to the construction of "subscriber," which has been resolved in Part I.B.2. of this Order in favor of ionLake. The only remaining difference between the

parties' proposed constructions is the meaning of a "software module." CellTrust's proposed construction defines a "software module" narrowly, whereas the construction proposed by ionLake defines a "software module" more broadly.

Contrary to the parties' differing proposed constructions of "subscriber software module," the parties' joint claim construction statement reflects that the parties agree that a "software module" is "[a] software component or part of a program that contains one or more routines." Inexplicably, ionLake's proposed construction of "subscriber software module" deviates from the parties' joint claim construction statement. The jointly proposed construction of "software module" is consistent with the specification of the '837 Patent, which describes a "software module" as a computer program that, in some embodiments, contains multiple subcomponent functions:

> In some embodiments, fourth software module **1672** can be configured as one or more of a secure messaging module **201**, second software module **72**, a secure voice module, secure audio module, secure video module, secure video streaming module, secure video conferencing module, and secure multimedia module.

The proper construction of "subscriber software module" should be consistent with the parties' jointly proposed construction of "software module," as is contemplated by CellTrust's proposed construction.

The Court, therefore, rejects ionLake's proposed construction of the term "subscriber software module" and adopts CellTrust's proposed construction of this term, as modified to be consistent with the Court's construction of the claim term "a

subscriber"—namely, "[a] software component or part of a program that contains one or more routines used by a subscriber (i.e., a user)."

### 4. "electronic discovery"

| CellTrust's Construction | ionLake's Construction |
|---|---|
| The discovery of electronically stored information (ESI) to meet the mandates imposed by requirements for civil or criminal litigation, regulatory oversight, or administrative proceedings. | The electronic aspect of collecting or producing electronically stored information. |

The parties dispute the meaning of the term "electronic discovery," which appears in asserted claims 3, 6, 13, 16 and 22 of the '837 Patent. Claim 3 of the '837 Patent provides a representative example of the disputed "electronic discovery" term:

> **3.** The method of claim **1** wherein the Enterprise Information Archiving system is configured for **electronic discovery**.

(Emphasis added.) The parties' arguments pertaining to this disputed claim term are identical to their arguments pertaining to the term "electronic discovery" in the '012 Patent, which are addressed in Part I.A.1. of this Order and resolved in CellTrust's favor. For the reasons addressed in Part I.A.1. of this Order, the Court reaches the same conclusion here.

The Court, therefore, rejects ionLake's proposed construction of "electronic discovery" and adopts CellTrust's proposed construction of "electronic discovery"—namely, "[t]he discovery of electronically stored information (ESI) to meet the mandates

imposed by requirements for civil or criminal litigation, regulatory oversight, or administrative proceedings."

### 5.    "Enterprise Information Archiving system"

| CellTrust's Construction | ionLake's Construction |
|---|---|
| Any system for enterprise information archiving, a type of archiving that incorporates products and solutions for archiving user content and other data types with at least basic tools for e-discovery. | A computer system usable by an organization that can store and can access electronic information. |

The parties dispute the meaning of the term "Enterprise Information Archiving system," which appears in asserted claims 1, 3, 5, 6, 11, 13, 15, 16, 20 and 22 of the '837 Patent.   The '837 Patent includes the following representative examples of this disputed claim term:

> [Claim 1]
> . . . wherein the gateway is configured to send the communication to the subscriber software module associated with the subscriber business number and to an **Enterprise Information Archiving system**.
>
> . . .
>
> [Claim 3]
> The method of claim **1** wherein the **Enterprise Information Archiving system** is configured for electronic discovery.

(Emphasis added.)

The parties agree that the most relevant reference to an "Enterprise Information Archiving system" in the '837 Patent appears in column 9 of the specification as follows:

> Most companies use email archiving systems such as HP Autonomy, Global Relay, ArcMail, IBM Content Collector, Smarsh or Symantec Enterprise Vault.   For a more comprehensive list of such products, please see Gartner Magic Quadrant for Enterprise Information Archiving at http://www.storagenewsletter.com/rubriques/market-reportsre search/gartner-magic-quadrant-for-enterprise-information-arc hiving.   Such archiving systems are typically used for eDiscovery and are capable of archiving email communication within the enterprise.

According to ionLake, CellTrust's proposed construction improperly limits an "Enterprise Information Archiving system" to systems that include "at least basic tools for e-discovery."   Although the specification provides that "archiving systems are *typically* used for eDiscovery," this language, at most, suggests that such systems are often, but not always, used for such purposes.  (Emphasis added.)  In addition, the claim language does not support such a limitation, and the Court may not import limitations from the written description into the claims.  *Laitram Corp.*, 163 F.3d at 1347.

In addition, the doctrine of claim differentiation creates a presumption that the use of different terms in different patent claims indicates that those claims should be ascribed different scope or meaning.  *See Chi. Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012); *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369 (Fed. Cir. 2007).  This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim."  *Acumed*, 483 F.3d at 806.  Here, the only difference in the use of the term "Enterprise Information Archiving system" between independent claim 1 and dependent claim 3 of the '837 Patent is that the latter claim describes the "Enterprise Information

Archiving system" as "configured for electronic discovery."   As such, construing "Enterprise Information Archiving system" as narrowly limited to systems that include "at least basic tools for e-discovery" would essentially eliminate the only difference between independent claim 1 and dependent claim 3.   Such a construction would contravene the doctrine of claim differentiation.

Moreover, the same logic applied when construing "email archiving system" in Part I.A.3. of this Order applies here.   Even if the claim term "Enterprise Information Archiving system" were limited to systems akin to the examples listed in the specification, the scope of these examples does not support CellTrust's proposed construction.   The specification provides examples and indicates that such systems *typically* are used for eDiscovery and capable of archiving email communications.   But the specification does not define any universal functionality characteristic of every Enterprise Information Archiving system.   And nothing in the specification suggests that an email archiving system must "incorporate[ ] products and solutions for archiving user content and other data types with at least basic tools for e-discovery."   CellTrust's proposed construction improperly narrows the scope of the term "Enterprise Information Archiving system" in a manner that is not supported by the claim language or the specification.

By contrast, ionLake's proposed construction—"[a] computer system usable by an organization that can store and can access electronic information"—is consistent with the plain language of the term "Enterprise Information Archiving system" and the use of that

term in both the claim language and the specification. CellTrust counters that this construction is overly broad. But CellTrust identifies nothing in the '837 Patent that defines "Enterprise Information Archiving system" more narrowly. Moreover, CellTrust does not identify any meaningful distinction between its position that an "Enterprise Information Archiving system" must be capable of "archiving user content and other data types" and ionLake's position that such a system "can store and can access electronic information."

 For these reasons, the Court rejects CellTrust's proposed construction of "Enterprise Information Archiving system" and adopts ionLake's proposed construction of this term—namely, "[a] computer system usable by an organization that can store and can access electronic information."

   6. **"wherein the Enterprise Information Archiving system is configured for electronic discovery"**

| CellTrust's Construction | ionLake's Construction |
|---|---|
| The Enterprise Information Archiving system has been designed or combined with other elements to be able to perform functionalities of electronic discovery, such as the identification, preservation, compiling, storing, processing, review, securing, or production of information to meet the mandates imposed by requirements for civil or criminal litigation, regulatory oversight, or administrative proceedings. | A computer system usable by an organization configured for at least one of preserving, searching, reviewing, and producing electronically stored information. |

The parties dispute the meaning of the phrase "wherein the Enterprise Information Archiving system is configured for electronic discovery," which appears in asserted claims 3, 6, 13, 16 and 22 of the '837 Patent.

This disputed claim language comprises three combined phrases: (1) "Enterprise Information Archiving system," which the court has construed in ionLake's favor in Part I.B.5. of this Order; (2) "is configured for," the past participle of "configure," which the Court has construed in CellTrust's favor in Part I.A.7. of this Order; and (3) "electronic discovery," which the Court has construed in CellTrust's favor in Part I.A.1. and Part I.B.4. of this Order. The parties have not suggested any basis for the Court to construe the *combination* of these phrases in a way that differs from the Court's construction of each individual component phrase, and doing so could create confusion. The Court, therefore, rejects *both* parties' proposed constructions of this disputed claim language and instead construes this combination of phrases to be consistent with the construction of each individual phrase.

For these reasons, the Court construes this claim language as follows: "An Enterprise Information Archive system (i.e., a computer system usable by an organization that can store and can access electronic information) that has been designed or combined with other elements to be able to perform electronic discovery (i.e., the discovery of electronically stored information (ESI) to meet the mandates imposed by requirements for civil or criminal litigation, regulatory oversight, or administrative proceedings)."

## II.      Cross-Motions for Summary Judgment

The parties cross-move for summary judgment as to Defendants' counterclaims and affirmative defenses asserting that the CellTrust Patents are invalid.

Summary judgment is proper when the record before the district court establishes that there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists when there is evidence that, if believed, would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When considering a motion for summary judgment, a district court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014).  The party asserting that a fact is genuinely disputed must cite "particular parts of materials in the record" that support the assertion.  Fed. R. Civ. P. 56(c)(1)(A); *accord Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). In doing so, the nonmoving party must demonstrate the existence of specific facts in the record that create a genuine fact issue for trial. *Krenik*, 47 F.3d at 957.

An issued patents is "presumed valid."  35 U.S.C. § 282(a).  "The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." *Id.*  A party asserting that a patent is invalid must establish invalidity by clear-and-convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 111

(2011).  In doing so, the party asserting invalidity "bears a heavy burden of persuasion." *Id.* at 101 (internal quotation marks omitted).

Here, Defendants allege that the CellTrust Patents are invalid on five bases: obviousness under 35 U.S.C. § 103, anticipation under 35 U.S.C. § 102, claiming abstract ideas under 35 U.S.C. § 101, indefiniteness under 35 U.S.C. § 112, and under the doctrine of prosecution history estoppel.  CellTrust counters that Defendants' prior art statement fails to comply with the pretrial scheduling order in this case, thus entitling CellTrust to summary judgment as a matter of law as to invalidity.  In the alternative, CellTrust contends that Defendants have presented insufficient evidence for a reasonable jury to return a verdict of invalidity.  The Court addresses each argument in turn.

### A.    Sufficiency of Defendants' Prior Art Statement

As a threshold matter, CellTrust contends that Defendants' prior art statement fails to comply with the pretrial scheduling order and, therefore, CellTrust is entitled to summary judgment as a matter of law as to invalidity.  According to Defendants, this argument is an untimely discovery dispute that CellTrust has waived.

Pursuant to the magistrate judge's pretrial scheduling order, fact discovery ended on July 1, 2021; expert discovery ended on November 22, 2021; and all non-dispositive motions were to be filed on or before November 29, 2021.  In addition, the pretrial scheduling order required the parties to exchange prior art statements as follows:

> a. On or before February 8, 2021, the party defending against infringement shall serve to the opposing party a Prior Art Statement listing . . . all of the prior art on which it relies, and a complete and detailed explanation of what it alleges the

prior art shows and how that prior art invalidates the claim(s) asserted by the party alleging infringement, including: (i) which claim(s) alleged to be infringed are invalid; (ii) which prior art, if any, invalidates each claim; (iii) where in such prior art each element of the allegedly invalid claims may be found; and (iv) whether a basis for invalidity other than prior art is alleged, specifying what the basis is and whether such allegation is based upon 35 U.S.C. 101, 102, 103, and 112, or any other statutory provisions.

b. On or before March 22, 2021, the party alleging infringement shall serve its own Prior Art Statement, in which it will state in detail its position on what the prior art relied upon by the opposing party shows, if its interpretation differs, and its position on why the prior art does not invalidate the asserted patent claims.

It is undisputed that Defendants served a timely prior art statement as required by the pretrial scheduling order and that CellTrust served a timely responsive prior art statement.

CellTrust now argues in its motion for summary judgment, for the first time, that Defendants' prior art statement is inadequate because it fails to provide "a complete and detailed explanation of what [Defendants] allege[ ] the prior art shows and how that prior art invalidates" the asserted claims of the CellTrust Patents. But CellTrust received Defendants' prior art statement in February 2021 and substantively responded to it. CellTrust did not challenge the sufficiency of Defendants' prior art statement before fact discovery ended in July 2021, before expert discovery ended in November 2021 or before the deadline to file non-dispositive motions in November 2021. Indeed, it is undisputed that CellTrust neither moved to strike Defendants' prior art statement nor moved to

compel compliance with the pretrial scheduling order. CellTrust's argument is an untimely effort to advance a non-dispositive discovery motion.[6]

CellTrust's attempt to reframe its argument as a dispositive summary-judgment issue lacks merit. "The purpose of [a] prior art statement is to commit parties to their respective position[s], to focus discovery efforts, and to thereafter avoid surprise or ambush at trial." *Ecolab USA Inc. v. Diversey, Inc.*, No. 12-cv-1984 (SRN/HB), 2014 WL 11497947, at *3 (D. Minn. Oct. 2, 2014) (internal quotation marks omitted). If Defendants' prior art statement failed to fulfil this purpose, CellTrust's recourse was to bring an appropriate non-dispositive motion during discovery to challenge the alleged inadequacy. The legal standard on summary judgment pertains to whether evidence in the record establishes a genuine dispute of material fact, *not* whether the opposing party complied with the pretrial scheduling order or provided adequate notice as to the bases for a counterclaim or defense. Had CellTrust raised a timely challenge to the adequacy of

---

[6]     Because Defendants undisputedly disclosed their invalidity and prior art theories, and the parties largely dispute whether those disclosures were adequately detailed, this situation is distinguishable from cases in which a party *completely* fails to disclose an infringement or invalidity theory. *Compare QXMédical, LLC v. Vascular Sols., LLC*, 408 F. Supp. 3d 996, 1016 (D. Minn. 2019) (precluding party from presenting invalidity argument in support of summary judgment when that invalidity argument had not been disclosed as required by the scheduling order), *with Arctic Cat, Inc. v. Bombardier Recreational Prods. Inc.*, No. 12-2692 (JRT/LIB), 2018 WL 654218, at *6 & n.13 (D. Minn. Jan. 2, 2018) (observing that, because the patentee had provided an infringement contention that was "broad, but sufficient" to put defendant on notice, if the defendant considered the contention to be deficient, "the proper remedy would have been non-dispositive motion practice"). Here, Defendants' prior art statement was, at worst, broad and insufficiently detailed. And Defendants timely served their prior art statement long before discovery ended. As such, CellTrust had a fair opportunity to challenge the overall sufficiency of the prior art statement during discovery.

Defendants' prior art statement, the magistrate judge could have addressed and resolved the issue during discovery. Because CellTrust undisputedly failed to do so, its challenge to Defendants' prior art statement is untimely.

In seeking to avoid this result, CellTrust relies on *Tire Service Equipment Manufacturing Co. v. Gaither Tool Co.*, in which the district court granted summary judgment as to invalidity after concluding that the defendant's prior art statement did not adequately put the plaintiff on notice of the defendant's invalidity claims. 158 F. Supp. 3d 774, 777–80 (D. Minn. 2016). But in *Tire Service*, unlike in this case, the plaintiff successfully moved to strike the defendant's noncompliant prior art statement before summary judgment motions were filed. *Id.* at 778. Moreover, the district court did not grant summary judgment based on the inadequacy of the prior art statement. Instead, the court evaluated the substance of the materials cited in the noncompliant prior art statement and the evidence in the record and deemed this evidence inadequate to raise a genuine dispute of material fact as to invalidity. *See id.* at 779–80 (observing that "[d]efendant does not point to *record evidence* that would allow a reasonable jury to find by clear and convincing evidence that any of the claims in issue are invalid" (emphasis added)). In contrast, here, CellTrust did not move to strike Defendants' prior art statement. And CellTrust's challenge to the sufficiency of Defendants' prior art statement does not address whether the *evidence in the record* raises a genuine dispute of material fact as to invalidity. As such, *Tire Service* is inapposite.

For these reasons, CellTrust's motion for partial summary judgment based on an untimely challenge to the adequacy of Defendants' prior art statement is denied.

### B.     Invalidity for Obviousness (35 U.S.C. § 103)

Defendants allege that the CellTrust Patents are obvious in light of certain combinations of prior art and, therefore, invalid under 35 U.S.C. § 103. The parties cross-move for summary judgment as to this issue.

A patent is invalid for obviousness "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. Determining whether a patent is invalid for obviousness requires considering "the scope and content of the prior art," any "differences between the prior art and the claims at issue," "the level of ordinary skill in the pertinent art," and "[s]uch secondary considerations as commercial success, long felt but unsolved needs, [and] failure of others." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (internal quotation marks omitted). Other relevant considerations include the "interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art." *Id.* at 418. The party seeking to invalidate a patent based on obviousness must establish, by clear-and-convincing evidence, that "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed

invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *InTouch Techs. Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1347 (Fed. Cir. 2014).

### 1.   Defendants' Motion for Summary Judgment as to Obviousness

Defendants contend that each of the asserted claims of the CellTrust Patents are obvious in light of United States Patent Application Publication No. 2011/0145564 by inventor Moshir (Moshir '564), together with prior art identified in the specifications of the CellTrust Patents.  The specific evidence on which Defendants rely in support of this theory consists of Moshir '564, the CellTrust Patents, and the opinions of Defendants' patent attorney expert, Brad Pedersen.

Pedersen's expert opinions are inadmissible for the reasons addressed in Part III.A. of this Order.  But even if Pedersen's expert opinions were admissible, an expert's testimony as to obviousness must provide more than "a conclusory statement that a person of ordinary skill in the art would have known . . . how to combine any of a number of [prior art] references to achieve the claimed inventions." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012). Because such a conclusory statement is "fraught with hindsight bias," an expert must provide a factual basis for such a conclusion.[7] *Id.*  Here, Pedersen offers the following opinion as to obviousness:

---

[7]   An expert can "guard against this hindsight bias by appropriately considering all objective evidence of nonobviousness," including but not limited to the commercial success of the patentee's product or service and industry praise. *InTouch Techs.*, 751

> It is also my opinion that the last clause of the critical sentence in paragraph [0085] of Moshir '564 teaches use of the disclosed archiving system for "any other desired use," and that this passage *certainly would have made it obvious to a person skilled in the art* as of the earliest effective filing date of the Asserted Claims of the [CellTrust Patents] to use the archiving system as taught by Moshir '564 for compliancy reporting as represented by the various archiving systems that are [prior art] as disclosed in the [CellTrust Patents] . . . .

(Emphasis added.)  The foregoing obviousness opinion is conclusory and has no apparent factual basis.  And Pedersen's obviousness opinion does not address whether, let alone provide clear-and-convincing evidence that, "a skilled artisan would have been motivated to combine the teachings" of Moshir '564 and other prior art references disclosed in the CellTrust Patents or "that the skilled artisan would have had a reasonable expectation of success in doing so."  *InTouch Techs.*, 751 F.3d at 1347.   Defendants offer no argument or evidence to address these deficiencies.   Indeed, Defendants only briefly reference obviousness in their opening memorandum of law and do not address obviousness at all in their reply memorandum.

It is Defendants' burden to overcome the presumption of patent validity and prove invalidity by clear-and-convincing evidence.  35 U.S.C. § 282(a); *Microsoft Corp.*, 564 U.S. at 111.  Pedersen's conclusory and incomplete obviousness opinions do not satisfy this burden, and Defendants identify no other evidence to affirmatively establish that they are entitled to summary judgment as to this issue.

---

F.3d at 1352 ("By failing to account for objective evidence of nonobviousness, [the accused infringer's expert's] analysis was incomplete, and ultimately insufficient to establish obviousness by clear and convincing evidence.").  Pedersen's expert report does not address any objective evidence of nonobviousness, however.

Accordingly, Defendants' motion for summary judgment of invalidity based on obviousness is denied.

### 2.     CellTrust's Motion for Summary Judgment as to Obviousness

In CellTrust's motion for summary judgment, CellTrust's argument pertaining to obviousness primarily relies on the alleged inadequacy of Defendants' prior art statement and does not address the substance of the relevant evidence in the record.  For the reasons addressed in Part II.A. of this Order, CellTrust is not entitled to summary judgment on this basis.

However, because an issued patent is presumed valid, "to prevail on [a] motion for summary judgment of validity, [the patentee] need not have presented any factual evidence."  *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997).  As such, CellTrust may be entitled to summary judgment as to Defendants' obviousness defense and counterclaims if Defendants, having received a full and fair opportunity to address this issue, fail to identify a genuine dispute of material fact sufficient to overcome the presumption of validity.  *See id.*

In responding to CellTrust's motion for summary judgment, Defendants rely on an obviousness theory that differs from the obviousness theory advanced in their affirmative motion for summary judgment.  Instead of relying on Pedersen's expert opinions and the combination of Moshir '564 with other prior art, Defendants counter CellTrust's motion for summary judgment by relying on the combination of United States Patent Application Publication No. 2012/0089747 by inventor Attanasio (Attanasio '747) with several

Google products.  In support of this theory, the specific evidence on which Defendants rely consists of the opinions of Defendants' technology expert, Alexandre Antonov. Antonov's expert reports include claim charts that purport to map these prior art references to every limitation of the CellTrust Patents.  In addition, Antonov provides seven reasons why a person of ordinary skill in the art would be motivated to combine these prior art references and why that person would have a reasonable expectation of success in doing so.

In support of its motion for summary judgment, CellTrust does not specifically challenge—or even reference—Antonov's opinions.  To prevail on its motion for summary judgment, CellTrust must show that the materials cited by Defendants "do not establish the absence . . . of a genuine dispute" of material fact or that Defendants "cannot produce admissible evidence to support" the asserted material fact.  Fed. R. Civ. P. 56(c)(1)(B).  CellTrust separately challenges the admissibility of Antonov's invalidity opinions.  However, as addressed below in Part III.B. of this Order, CellTrust's arguments implicate the weight and credibility of Antonov's opinions, not their admissibility.  As such, there is a genuine dispute of material fact as to whether the asserted claims in the CellTrust Patents are obvious in light of Attanasio '747 combined with other prior art references, as analyzed by Antonov.

For these reasons, CellTrust's motion for summary judgment of invalidity based on obviousness in light of Attanasio '747 combined with several Google products, as analyzed by Antonov, is denied.

## C.    Invalidity for Anticipation (35 U.S.C. § 102)

Defendants also allege that the CellTrust Patents are anticipated by prior art and, therefore, invalid under 35 U.S.C. § 102.  The parties cross-move for summary judgment as to this issue.

A person is not entitled to a patent if "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. § 102(a).  "A patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention." *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  The disclosure of a claim limitation in a prior art reference may be either express or inherent. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1306 (Fed. Cir. 2019).  Whether a patent claim is invalid based on anticipation "is a question of fact." *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012).

The parties' arguments as to anticipation focus solely on whether the asserted claims of the CellTrust Patents are anticipated by Moshir '564.  In support of their anticipation allegations, Defendants rely on Moshir '564 and the opinions of Defendants' patent attorney expert, Brad Pedersen.   However, although Defendants' prior art statement lists numerous prior art references that allegedly anticipate the asserted claims of the CellTrust Patents, Defendants' prior art statement does *not* specifically identify Moshir '564 as an anticipating reference.

The magistrate judge required the parties to exchange prior art statements before the close of discovery, including "a complete and detailed explanation of what it alleges the prior art shows and how that prior art invalidates the" CellTrust Patents.  The purpose of exchanging such statements was "to require parties to crystallize their theories of the case early in the litigation so as to prevent the shifting sands approach to claim construction."  *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006) (internal quotation marks omitted).  Such discovery requirements are "designed to allow the defendant to pin down the plaintiff's theories of liability and to allow the plaintiff to pin down the defendant's theories of defense, thus confining discovery and trial preparation to information that is pertinent to the theories of the case."  *Id.* at 1365.  "By identifying and solidifying theories of liability early in litigation, claim charts—and, by natural extension, prior art statements—clarify infringement contentions and defenses, and, as a direct result, serve to efficiently focus and advance discovery."  *Arctic Cat, Inc. v. Bombardier Recreational Prods., Inc.*, No. 12-cv-2692 (JRT/LIB), 2014 WL 12599608, at *2 (D. Minn. Sept. 19, 2014).

For the reasons addressed above, CellTrust's untimely attempt to challenge the level of detail provided in Defendants' prior art statement lacks merit and should have been addressed through a motion to strike or compel compliance during discovery.  As such, any deficiencies in Defendants' prior art statement do not *categorically* entitle CellTrust to summary judgment.  That does not end the analysis of this issue, however.

A district court has broad discretion to exclude from evidence any matter that was not properly disclosed in compliance with the court's pretrial orders or the parties' discovery obligations. *See Philip v. Ford Motor Co.*, 328 F.3d 1020, 1024 (8th Cir. 2003); *see also* Fed. R. Civ. P. 16(f)(1)(C), 37(b)(2)(A)(ii), 37(c)(1) (permitting a district court to exclude from evidence any information not properly disclosed during discovery or in compliance with any pretrial order); *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1374 (Fed. Cir. 2002) (recognizing that exclusion of evidence is the "normal sanction" for failure to comply with discovery requirements). A litigant in a patent case "who fails to meet its obligations to disclose its positions and contentions on infringement and validity may risk losing the opportunity later to rely on information that was not properly disclosed." *Polaris Indus. Inc. v. CFMOTO Powersports, Inc.*, No. 10-cv-4362 (JNE/HB), 2015 WL 13637322, at *4 (D. Minn. Apr. 27, 2015). In seeking summary judgment of invalidity based on anticipation, Defendants rely solely on the prior art reference Moshir '564 despite failing to specifically identify Moshir '564 as an anticipating reference in their prior art statement. On this basis alone, granting CellTrust's motion for summary judgment as to anticipation—and denying Defendants' cross-motion for summary judgment as to anticipation—is warranted.

Even if Defendants were permitted to rely on Moshir '564, this prior art reference does not disclose every limitation in the asserted claims of the CellTrust Patents. In particular, Moshir '564 does not appear to disclose, expressly or inherently, the following limitations in the asserted claims of the '012 Patent: "tracking communications between a

telephone and a mobile device" via a "virtual number associated with a software module configured to run on a mobile device" and "sending the communication to an electronic-discovery system."  And Moshir '564 does not appear to disclose, expressly or inherently, the following limitations in the asserted claims of the '837 Patent:  "tracking electronic communications for a subscriber" by "associating a subscriber business number with a subscriber software module configured to run on a subscriber mobile device" and "at a gateway, receiving a communication sent from a mobile device to the subscriber business number associated with the subscriber software module," "wherein the gateway is configured to send the communication to the subscriber software module associated with the subscriber business number and to an Enterprise Information Archiving system."  As CellTrust correctly observes, Moshir '564 does not reference the terms "virtual number," "virtual phone number," "eDiscovery" or any variation of that term, or an "Enterprise Information Archiving system."  Moreover, the USPTO concluded that the prior art, including Moshir '564, fails to disclose these claim limitations in the CellTrust Patents.

Defendants contend that Pedersen's expert reports, including claim charts prepared by Pedersen, identify where each claim limitation of the CellTrust Patents is disclosed in Moshir '564.  But Pedersen's expert reports and opinions must be excluded from evidence for the reasons addressed in Part III.A. of this Order.

Moreover, even if Pedersen's expert opinions were not excluded, Pedersen's opinions do not provide clear-and-convincing evidence that the CellTrust Patents are invalid as anticipated by Moshir '564.  In his expert report, Pedersen concedes that

Moshir '564 does not disclose the "electronic discovery system" claim limitation in the '012 Patent or the "Enterprise Information Archiving system" claim limitation in the '837 Patent.   Pedersen opines that these claim limitations are disclosed in Moshir '564 when considered together with *other* prior art references.   But anticipation requires "*a single prior art reference* [that] discloses each and every limitation of the claimed invention." *Schering Corp.*, 339 F.3d at 1377 (emphasis added).   Although proof of anticipation may include a prior art reference that inherently, rather than expressly, discloses a claim limitation, a claim limitation "may be inherently disclosed only if it is necessarily present, not merely probably or possibly present, in the prior art." *Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1364 (Fed. Cir. 2019) (internal quotation marks omitted).   Pedersen's opinions—even if admissible— would not provide clear-and-convincing evidence of anticipation because Pedersen concedes that Moshir '564 does not expressly disclose every claim limitation in the CellTrust Patents, and he does not opine that every claim limitation in the CellTrust Patents is necessarily present in Moshir '564.

For the foregoing reasons, CellTrust's motion for partial summary judgment is granted as to Defendants' counterclaims and affirmative defenses asserting invalidity for anticipation under 35 U.S.C. § 102, and Defendants' motion for summary judgment as to this issue is denied.

### D.    Invalidity for Claiming Abstract Ideas (35 U.S.C. § 101)

Defendants contend that claims 1 through 24 of the '012 Patent and claims 1 through 24 of the '837 Patent are invalid under 35 U.S.C. § 101 because they claim abstract ideas that are not patentable.   CellTrust affirmatively moves for summary judgment as to this invalidity issue, but Defendants do not.

Section 101 of the Patent Act defines the subject matter that is eligible for patent protection: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101.   The Supreme Court of the United States has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (internal quotation marks omitted).   When conducting a Section 101 analysis, a court must first "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* at 217.   If so, the court must next consider "the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* (internal quotation marks omitted).

CellTrust contends that Defendants have no evidence to support their conclusory contention that the asserted patent claims are "directed to the abstract idea of receiving, sending and storing data through the use of well-known technology" and that "the claims

amount to nothing more than conventional computer and communications system components operating according to their known and ordinary function, and therefore lack an inventive concept." Notably, Defendants' pleadings do not specifically reference Section 101. And in response to CellTrust's motion for summary judgment, Defendants do not identify any evidence or legal arguments in support of a Section 101 defense. Instead, Defendants repeat the conclusory allegations from their prior art statement. It is Defendants' burden to overcome the presumption of patent validity and prove invalidity by clear-and-convincing evidence. 35 U.S.C. § 282(a); *Microsoft Corp.*, 564 U.S. at 111. A party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik*, 47 F.3d at 957 (internal quotation marks omitted). Defendants have not attempted to do so here and, thus, have effectively abandoned any such defense.

Accordingly, CellTrust's motion for partial summary judgment is granted as to Defendants' invalidity defense pursuant to 35 U.S.C. § 101.

### E.     Invalidity Under 35 U.S.C. § 112

Defendants allege that several claims of the CellTrust Patents are invalid as indefinite and because they do not satisfy the written-description and enablement requirements of 35 U.S.C. § 112. CellTrust affirmatively moves for summary judgment as to this invalidity issue, but Defendants do not.

A patent specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact

terms as to enable any person skilled in the art to which it pertains . . . to make and use the same." 35 U.S.C. § 112(a). "Whether a patent claim is supported by an adequate written description is a question of fact." *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed. Cir. 2015). A patent specification also must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "[A] patent must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open" to the public. *Id.* at 909 (internal quotation marks omitted).

CellTrust contends that Defendants have no evidence to support their conclusory allegations that several of the asserted claims of the CellTrust Patents are invalid under Section 112 because the claims include terms that are not adequately defined in the specification, were added after the filing date of the application and have no descriptive matter in the original specification. To rebut this contention, Defendants rely on one interrogatory response that repeats the same conclusory allegations contained in Defendants' prior art statement and purports to incorporate by reference a March 26, 2020 memorandum of law that Defendants filed in support of a later-withdrawn motion to dismiss.

It is Defendants' burden to overcome the presumption of patent validity and prove invalidity by clear-and-convincing evidence. 35 U.S.C. § 282(a); *Microsoft Corp.*, 564 U.S. at 111. And a party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik*, 47 F.3d at 957 (internal quotation marks omitted). Defendants' reliance on a single vague and conclusory interrogatory response is insufficient to demonstrate the existence of *specific facts* that create a genuine issue for trial—particularly as to an issue that Defendants must prove by clear-and-convincing evidence.

CellTrust's motion for partial summary judgment, therefore, is granted as to Defendants' counterclaims and affirmative defenses asserting invalidity under 35 U.S.C. § 112.

### F. Prosecution History Estoppel

Defendants allege that claims 1, 11 and 20 of the '837 Patent are invalid under the doctrine of prosecution history estoppel. CellTrust affirmatively moves for summary judgment as to this invalidity issue, but Defendants do not.

"Prosecution history estoppel" prevents a patentee "from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent." *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1577–78 (Fed. Cir. 1997). "Arguments and amendments made to secure allowance of a claim, especially those distinguishing prior art, presumably give rise to prosecution history

estoppel." *Id.* at 1578. Prosecution history estoppel applies when the disclaimer was "both clear and unmistakable" and would have been evident to a person skilled in the art. *Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016). The party seeking to invalidate an issued patent on this basis must provide evidence of a clear and unmistakable disclaimer. *Id.*

CellTrust contends that Defendants have no evidence to support their vague and conclusory allegation that claims 1, 11 and 20 of the '837 Patent are invalid "for attempting to recapture yielded subject matter under the doctrine of prosecution history estoppel." Because Defendants fail to mention prosecution history estoppel in response to CellTrust's motion to dismiss, let alone identify evidence in support of this issue, they also fail to demonstrate a dispute of material fact that would create a genuine issue for trial.

CellTrust's motion for partial summary judgment is granted as to Defendants' counterclaims and affirmative defenses asserting invalidity under the doctrine of prosecution history estoppel.

In summary, the Court denies Defendants' motion for summary judgment of invalidity and grants CellTrust's motion for partial summary judgment as to invalidity on all bases except obviousness. Because disputed issues of material fact exist as to whether the CellTrust Patents are invalid as obvious in light of prior art references Attanasio '747 and several Google products, as analyzed by Defendants' technical expert, CellTrust's motion for partial summary judgment is denied as to this invalidity issue.

### III.    Motions to Exclude Expert Testimony

The parties also cross-move for the exclusion of expert testimony.   The admissibility of expert testimony is an issue of law for the district court to decide and is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  *Id.*

The proponent of expert testimony must prove its admissibility by a preponderance of the evidence.  *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony" and favors admissibility over exclusion.  *Id*. (internal quotation marks

omitted). Determinations as to the admissibility of expert testimony are within a district court's discretion. *See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997).

A district court must ensure that testimony admitted under Rule 702 "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. When making this reliability determination, a court may evaluate factors that include whether the expert's method has been tested or subjected to peer review and publication, the method's known or potential rate of error, and the method's general acceptance. *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 643 (8th Cir. 2009) (citing *Daubert*, 509 U.S. at 593–94). These factors are not exhaustive, and a court must evaluate the reliability of expert testimony based on the facts of the case. *Id.* A court also may consider "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 449 (8th Cir. 2008) (internal quotation marks omitted). When weighing these factors, a district court must function as a gatekeeper to separate "expert opinion evidence based on 'good grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

Expert testimony is not admissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case," *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d

748, 757 (8th Cir. 2006), such that it is "so fundamentally unsupported that it can offer no assistance to the jury," *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) (internal quotation marks omitted). But disputes about the factual basis of an expert's testimony ordinarily implicate the credibility—not the admissibility—of the testimony. *Sappington*, 512 F.3d at 450; *see also Minn. Supply Co.*, 472 F.3d at 544. The Court addresses, in turn, each challenged expert witness.

### A.    Brad Pedersen

CellTrust first moves to exclude the opinions of Pedersen, Defendants' patent-attorney expert. Defendants intend to offer Pedersen to opine about (1) the law governing the CellTrust Patents; (2) the earliest effective filing dates of the CellTrust Patents; (3) whether the CellTrust Patents are invalid for lack of written description, enablement or indefiniteness; and (4) whether the CellTrust Patents are invalid as anticipated or obvious in light of Moshir '564 and other prior art.

"As a general rule, questions of law are the subject of the court's instructions and not the subject of expert testimony." *United States v. Klaphake*, 64 F.3d 435, 438 (8th Cir. 1995) (internal quotation marks omitted); *accord S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) ("[E]xpert testimony on legal matters is not admissible."). "The admission of expert testimony about the requirements of the law 'would give the appearance that the court was shifting to witnesses the responsibility to decide the case.' " *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 952 (D. Minn. 2018) (quoting *Farmland Indus. v. Frazier-Parrott Commodities, Inc.*, 871

F.2d 1402, 1409 (8th Cir. 1989)).  Here, at least three dozen paragraphs of Pedersen's expert report involve explaining and interpreting patent-law concepts and do not involve the resolution of underlying factual disputes.  Such opinions are not the proper subject of admissible expert testimony and must be excluded.

Pedersen's invalidity opinions, including opinions pertaining to factual disputes about the effective filing dates of the CellTrust Patents, are a proper subject of expert testimony.  However, for the reasons addressed above in Part II of this Order, CellTrust is entitled to summary judgment as to all of Defendants' invalidity counterclaims and affirmative defenses about which Pedersen opines—in part because Defendants did not properly disclose the basis for Pedersen's invalidity theories as to anticipation during discovery.[8]  These aspects of Pedersen's opinions, therefore, are not relevant to any of Defendants' remaining counterclaims or affirmative defenses.  *Daubert*, 509 U.S. at 589 (observing that expert testimony must be both reliable *and relevant*).  Consequently, Pedersen's invalidity opinions as to irrelevant issues are inadmissible.

Even if Pedersen's invalidity opinions were relevant, Pedersen is unqualified to testify about issues involving the level of skill in the art.  The issue of patent validity is analyzed from the perspective of a person of ordinary skill in the art.  *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361 (Fed. Cir. 2008).  "Testimony proffered by a witness lacking the relevant technical expertise fails the standard of admissibility

---

[8]    Although there are genuine disputes of material fact as to whether the CellTrust Patents are invalid as obvious in light of several prior art references including Attanasio '747, Pedersen does not provide opinions as to these prior art references.

under Fed. R. Evid. 702" with respect to patent validity even if the proffered expert possesses expertise pertaining to patent law generally.  *Id.* at 1363 (holding that when "an issue calls for consideration of evidence from the perspective of one of ordinary skill in the art, it is contradictory to Rule 702 to allow a witness to testify on the issue who is not qualified as a technical expert *in that art*" (emphasis added)).

Here, the record reflects that Pedersen has practiced patent law since 1986, prosecuted patents before the USPTO, and represented clients in patent litigation and other patent-law proceedings.  But Pedersen's *technical* qualifications are limited to a 1981 degree in electrical engineering and several years as a systems analyst, programmer and computer-diagnostic engineer in the late 1970s and early 1980s.  The record reflects that Pedersen has minimal expertise pertaining to the fields of telecommunications technology and regulatory compliance, which are the primary subject matter of the CellTrust Patents.[9]  Pedersen elaborated at his deposition about his experience preparing patent applications relating to telecommunications technology.  But the record provides little insight as to the relevant substantive technical knowledge and skill that Pedersen gained from that experience, much of which occurred more than thirty years ago and did not necessarily involve the computer-programming aspects of the technology with which he worked.  Moreover, Pedersen acknowledged that he did not consider a specific

---

[9]     By contrast, Defendants' technical expert Antonov, whose qualifications are unchallenged, has extensive experience in software development that includes telecommunications technology and regulatory compliance.   Indeed, Defendants' proposed definition of a person skilled in the relevant art includes the qualifications of "at least two years practical experience in computers and telecommunications networking, including programming."  These are qualifications that Pedersen appears to lack.

definition as to the relevant level of skill in the art, but instead relied on a "general sense . . . of what a person skilled in the art would be." Nonetheless, Pedersen's report repeatedly opines about how certain aspects of the CellTrust Patents and prior art would be understood by a person of ordinary skill in the relevant art. On this record, Pedersen lacks the relevant qualifications to render such opinions. *See Sundance*, 550 F.3d at 1363. Consequently, even if Pedersen's invalidity opinions were relevant, they would not be admissible.

For these reasons, CellTrust's motion to exclude Pedersen's opinions is granted.

### B.   Alexandre Antonov

CellTrust next moves to exclude the opinions of Antonov, Defendants' technology expert. Defendants intend to offer Antonov to opine about (1) Defendants' alleged non-infringement of the CellTrust Patents and (2) the alleged invalidity of the CellTrust Patents based on obviousness, in light of the combination of several prior art references—namely, the combination of Attanasio '747 together with several Google products. Antonov's qualifications are not in dispute. Instead, CellTrust challenges the relevance and reliability of Antonov's opinions.

CellTrust first argues that Defendants' prior art statement fails to sufficiently disclose the bases for Antonov's obviousness opinions. [10] But unlike Pedersen's anticipation opinions based on Moshir '564, which are excluded in part because

---

[10]   Defendants contend, in their response brief, that "Antonov's opinions on anticipation under 35 U.S.C. § 102 are not the subject of CellTrust's arguments." But Antonov does not address anticipation in his expert report, and instead limits his invalidity opinions to the issue of obviousness under 35 U.S.C. § 103.

Defendants' prior art statement does not identify this information *at all*, Defendants' prior art statement identifies the bases for Antonov's obviousness opinions.   Indeed, Defendants' prior art statement identifies the prior art references on which Antonov relies (namely, Attanasio '747 and several Google products), asserts that the combination of these prior art references renders the CellTrust Patents obvious, and includes a detailed claim chart supporting these contentions.   Exclusion of Antonov's invalidity opinions on this basis, therefore, is unwarranted.

CellTrust next argues that Antonov's invalidity opinions are unreliable because he did not explain why or how a person of ordinary skill in the art would have made the alleged combination of these prior art references.   The record does not support this argument.   Antonov's expert reports include claim charts that purport to map the prior art references to every limitation of the CellTrust Patents.   In addition, Antonov provides seven reasons why a person of ordinary skill in the art would be motivated to combine these prior art references, including reasons why that person would have a reasonable expectation of success in doing so. [11]   Although CellTrust challenges Antonov's conclusions and identifies contrary evidence, these arguments pertain to the weight and credibility of Antonov's opinions, not their admissibility.   *See Sappington*, 512 F.3d at

---

[11]   In his expert reports and at his deposition, Antonov observed that he did not consider "the motivation of the inventor to create the invention" because such motivation is not relevant to the scope of the invention, which is "defined entire[ly] by the Claims." CellTrust's use of these quotes out of context is misleading.   An inventor's motivation to create an invention is distinct from the motivation of a person of ordinary skill in the art to combine prior art.   It is clear from the record, viewed in context, that Antonov expressly considered the motivation of a person of ordinary skill in the art to combine prior art references.

450; *Minn. Supply Co.*, 472 F.3d at 544.  Because weight and credibility are for the jury to decide, exclusion of Antonov's invalidity opinions on this basis is unwarranted.

CellTrust also argues that Antonov's rebuttal noninfringement opinions are irrelevant and unreliable in two ways.   First, CellTrust contends that Antonov's noninfringement analysis focuses on whether Defendants' allegedly infringing system operates in a particular way when set to its "default configuration."   According to CellTrust, these opinions are contradicted by facts in the record, including the testimony of ionLake representatives.  But disputes about the factual basis of an expert's testimony ordinarily are issues of credibility—not admissibility—of the expert's testimony.  *See Sappington*, 512 F.3d at 450; *Minn. Supply Co.*, 472 F.3d at 544.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.  As such, exclusion of these aspects of Antonov's noninfringement opinions is unwarranted.

Second, CellTrust contends that some of Antonov's noninfringement opinions suggest that an electronic-discovery system or an Enterprise Information Archiving system must be part of an infringing system.  Specifically, Antonov opines about whether Defendants' allegedly infringing system is "able to direct or control configuration" of such a system.   In response, Defendants concede that the relevance of these opinions pertains to Defendants' proposed claim constructions as to the configuration claim terms. Because the Court has resolved these claim-construction disputes in favor of CellTrust, as

addressed above in Part I.A.7. and Part I.B.6. of this Order, Antonov's noninfringement opinions as to this issue are not relevant and would be contrary to the Court's claim construction. Consequently, this narrow aspect of Antonov's noninfringement opinions must be excluded.

CellTrust's motion to exclude Antonov's opinions is granted in part as to any noninfringement opinions suggesting that an infringing system must be "able to direct or control configuration" of an electronic-discovery system or an Enterprise Information Archiving system. CellTrust's motion to exclude Antonov's opinions is denied in all other respects.

### C.    Kevin H. Besikof

CellTrust next moves to exclude the opinions of Defendants' damages expert, Kevin H. Besikof. Defendants intend to offer Besikof to rebut the testimony of CellTrust's damages expert and to opine about the damages, if any, suffered by CellTrust if CellTrust prevails on its patent-infringement claims.

If patent infringement is proved, "the court shall award the [patentee] damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. The phrase "damages adequate to compensate" in Section 284 "includes any foreseeable lost profits the patent owner can prove." *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999). If a patentee cannot prove lost profits, the statute sets "a reasonable royalty" as the damages

floor.  *See* 35 U.S.C. § 284 (providing that damages for patent infringement can be "in no event less than a reasonably royalty").

To recover lost profits as opposed to a reasonable royalty, "a patent owner must prove a causal relationship between the infringement and its loss of profits."  *BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993).  In other words, "[t]he patent owner must show that 'but for' the infringement, [the patent owner] would have made the infringer's sales."  *Id.*  The United States Court of Appeals for the Federal Circuit has adopted the four-factor *Panduit* test as one method for a patentee to establish entitlement to lost profits damages.  *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995).  This test requires the patentee to establish (1) demand for the patented product, (2) the absence of acceptable non-infringing alternatives, (3) the patentee's manufacturing and marketing capability to exploit the demand, and (4) the amount of profit that the patentee would have made.  *Id.* (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)).

If a patentee does not prove entitlement to lost profits, the patentee is entitled to a reasonable royalty, typically established based on a hypothetical negotiation.  *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995).  The "hypothetical negotiation" is intended "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."  *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (internal quotation marks omitted).  A hypothetical reasonable royalty is calculated using the fifteen

"comprehensive (but unprioritized and often overlapping)" *Georgia-Pacific* factors. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).

CellTrust challenges Besikof's rebuttal opinions pertaining to both lost-profits damages and reasonable-royalty damages.   The Court addresses each category of Besikof's opinions in turn.

### 1. Lost-Profits Opinions

CellTrust first argues that Besikof should be precluded from offering a legal opinion pertaining to lost profits—namely, his opinion that CellTrust cannot recover lost profits because CellTrust's damages expert, Bryce R. Cook, failed to consider the *Panduit* factors.   Generally, "expert testimony on legal matters is not admissible." *S. Pine Helicopters*, 320 F.3d at 841.   But CellTrust concedes that "[a]ny criticism Besikof may have of Cook's discussion of the *Panduit* factors is a matter of weight rather than admissibility."   Although Besikof may not testify about the legal sufficiency of CellTrust's evidence, the *Panduit* factors involve factual determinations.   And disputes about the factual basis of an expert's testimony ordinarily are issues of credibility—not admissibility—of the expert's testimony. *See Sappington*, 512 F.3d at 450; *Minn. Supply Co.*, 472 F.3d at 544.   For these reasons, exclusion of Besikof's expert opinions on this basis is unwarranted.

CellTrust next argues that Besikof's opinions about CellTrust's ability to recover incremental expenses are factually unsupported and unreliable.   Specifically, CellTrust

contends that Besikof erred by identifying Twilio, CellTrust's IT department and shared revenue as variable expenses, and that the regression analysis Besikof uses to identify these expenses is flawed because it relies on insufficient and incomplete data. But again, disputes about the factual basis of an expert's testimony ordinarily are issues of credibility—not admissibility—of the expert's testimony. *See Sappington*, 512 F.3d at 450; *Minn. Supply Co.*, 472 F.3d at 544. Although an expert's analysis may be inadmissible if it contradicts *all* the available evidence, *see Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 633 (8th Cir. 2012) (citing *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005)), those circumstances do not apply to Besikof's regression analysis. Instead, CellTrust contends that Besikof considered "too few data points," that he "ignore[d] relevant data from before March 2018," and that the statistical significance of some of his calculations is below a 95-percent confidence level. These criticisms might impact the credibility of Besikof's opinions, but they do not demonstrate that Besikof's opinions are contrary to all available evidence and must be excluded. Indeed, "a regression analysis that includes less than all measurable variables" ordinarily is admissible because a "failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring). Exclusion of Besikof's expert opinions on this basis, therefore, is unwarranted.

CellTrust next argues that Besikof's opinion on price-erosion damages is unsupported speculation. To recover price-erosion damages, a patentee must "show that

'but for' infringement, [the patentee] would have sold its product at higher prices." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1357 (Fed. Cir. 2001). CellTrust's damages expert, Cook, considered price-erosion facts including an instance in which CellTrust had to lower prices to compete with ionLake. In his rebuttal report, Besikof criticizes Cook's price-erosion analysis, opining that Cook "failed to properly consider pricing structure and overhead" and "the differing sales channels of ionLake and CellTrust." Defendants contend that Besikof's price-erosion opinions are unnecessary, but Defendants wish to reserve the right to challenge CellTrust's claim of price-erosion damages at trial.

The function of a rebuttal expert is to "explain, repel, counteract or disprove" the testimony of the opposing expert witness. *United States v. Luschen*, 614 F.2d 1164, 1170 (8th Cir. 1980). Here, Besikof is not offering an affirmative price-erosion opinion, he is instead rebutting Cook's opinions by applying his knowledge and experience to identify purported flaws in Cook's analysis. Because it is CellTrust's burden to prove price-erosion damages, Besikof has no obligation to present contrary price-erosion evidence. Rather, he need only introduce doubt as to the credibility of Cook's price-erosion opinions, which his anticipated testimony purports to do. Exclusion of Besikof's expert opinions on this basis, therefore, is unwarranted.

For these reasons, CellTrust's motion to exclude Besikof's opinions pertaining to lost-profits damages is denied.

## 2.   Reasonable-Royalty Opinions

CellTrust next argues that Besikof's reasonable-royalty opinions should be excluded because they are factually unsupported.  Besikof's reasonable-royalty analysis spans more than two-dozen pages of his expert report, addresses each of the relevant *Georgia-Pacific* factors, and applies case-specific facts to those factors.   Besikof analyzed licensing arrangements pertaining to allegedly comparable technology involving messaging, email, security and mobile devices and, after adjusting for certain variables, concluded that the average royalty rate for similar products is "between 0.07% and 10%" resulting in "an average of 5%."  From this baseline, Besikof adjusted the hypothetical royalty rate based on the *Georgia-Pacific* factors.  Among other factors, Besikof relied on the market relationship between CellTrust and ionLake, each party's respective sales strategies and market knowledge and how long the parties have marketed and sold their respective products.  Besikof also reviewed and considered, among other evidence, the CellTrust Patents, CellTrust's reseller agreements, publicly available information from at least one of CellTrust's resellers, historical data as to CellTrust's costs and revenues and Besikof's knowledge of ionLake's needs.  Besikof concludes:

> After careful consideration of the *Georgia-Pacific* Factors, documents reviewed in this matter, the analysis outlined in this report, publicly available information, as well as my education, training and professional experience, it is my opinion that CellTrust and ionLake would have agreed to a hypothetically negotiated reasonable royalty of 8% for the Patents-in-Suit.

CellTrust's contention that Besikof's reasonable-royalty opinions are factually unsupported lacks merit. CellTrust challenges the weight and credibility of Besikof's opinions, which is not a basis for excluding his testimony.[12] As such, exclusion of Besikof's expert opinions on this basis is unwarranted.

CellTrust also argues that Besikof should be precluded from testifying about third-party licensing arrangements in connection with the twelfth *Georgia-Pacific* factor. That factor pertains to the "portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." *Georgia-Pacific*, 318 F. Supp. at 1120. According to CellTrust, the third-party agreements that Besikof deemed to be comparable "are far from relevant because they concerned different technology, involved different types of businesses, and had market and economic conditions between the parties that are markedly different than the parties in this matter."

When a party relies on other licenses to establish a reasonable royalty, those other licenses must be "sufficiently comparable to the hypothetical license at issue" because "a loose or vague comparability between different technologies or licenses does not suffice." *VirnetX*, 767 F.3d at 1330 (internal quotation marks omitted). However, the Federal

---

[12]     Besikof also rebuts Cook's reasonable royalty analysis, identifying purported flaws in the analysis. Such opinions are appropriate for a rebuttal expert, whose role is to "explain, repel, counteract or disprove" the testimony of the opposing expert witness. *Luschen*, 614 F.2d at 1170. As addressed above, it is CellTrust's burden to prove its damages, and Besikof need not support every criticism of Cook's analysis with affirmative evidence. Instead, Besikof may rely on his knowledge and experience to attack the credibility of Cook's opinions by identifying purported flaws in Cook's analysis.

Circuit has "never required identity of circumstances; on the contrary, [the Federal Circuit has] long acknowledged that any reasonable royalty analysis necessarily involves an element of approximation and uncertainty." *Id.* (internal quotation marks omitted). Allegedly comparable licenses may be insufficient if they demonstrate "no relationship to the claimed invention," no "discernible link to the claimed technology," involve "vastly different situations," or pertain to "subject matter . . . [that] was not even ascertainable from the evidence." *Id.* (internal quotation marks omitted).   But absent such circumstances, "the degree of comparability of the license agreements" may instead be "a factual issue best addressed by cross examination and not by exclusion." *Id.* at 1331 (internal quotation marks and brackets omitted).

Here, CellTrust contends that the allegedly comparable licenses Besikof relies on for his reasonable-royalty analysis are not sufficiently comparable to a hypothetical license of the technology claimed in the CellTrust Patents.  Besikof relied on licenses related to "messaging, email, security and mobile devices" or "patents specifically directed to the fundamental process of using a mobile device or sending a text message or email."  Although CellTrust correctly observes that these licenses pertain to technology that is not identical to CellTrust's patented technology, that is not the applicable standard. *See id.* at 1330–31.   Moreover, when relying on third-party licenses, Besikof acknowledges and purports to account for any differences between the technologies and business circumstances involved. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) (observing that "[t]estimony relying on licenses must account for

such distinguishing facts when invoking them to value the patented invention" and "the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility").

CellTrust's arguments ignore the reality that allegedly comparable licenses "are almost never perfectly analogues to the infringement action" because they "may cover more patents than are at issue in the action, include cross-licensing terms, cover foreign intellectual property rights, or . . . be calculated as some percentage of the value of a multi-component product." *Id.* Significantly, Besikof did not rely on licenses with no "relationship to the claimed invention" or "discernible link to the claimed technology." *VirnetX*, 767 F.3d at 1330 (internal quotation marks omitted). CellTrust's disagreements with Besikof's analysis pertain to the degree of comparability between third-party licenses and CellTrust's patented technology and business circumstances, which is an issue of weight and credibility best addressed through cross examination and the presentation of contrary evidence rather than the exclusion of Besikof's opinions from evidence. *Id.* at 1331. As such, exclusion of Besikof's expert opinions on this basis is unwarranted.

For these reasons, CellTrust's motion to exclude Besikof's opinions pertaining to reasonably-royalty damages is denied.

### D.   Bryce R. Cook

Defendants move to exclude the opinions of Cook, CellTrust's damages expert. Defendants argue that Cook's opinions as to lost profits are factually unsupported and

unreliable.  Defendants also contend that Cook's opinions as to a reasonably royalty are arbitrary and unreliable.

### 1.  Lost-Profits Opinions

Defendants first argue that Cook fails to correctly apply the applicable legal standard for calculating lost profits.

As addressed above, the Federal Circuit has adopted the four-factor *Panduit* test as one method—but not the exclusive method—for a patentee to establish entitlement to lost-profits damages.  *Rite-Hite Corp.*, 56 F.3d at 1545.  The Federal Circuit has recognized other appropriate methods for proving lost profits, including the market-share approach.  *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989).  Under this approach, a patentee recovers lost profits on a percentage of infringing sales that is equal to the patentee's market share.  *Id.* at 1578. "In the two-supplier market, it is reasonable to assume, provided the patent owner has the manufacturing and marketing capabilities, that it would have made the infringer's sales."  *Id.*  Thus, under the two-supplier market test, a patentee must show (1) the relevant market contains only two suppliers, (2) that the patentee had the manufacturing and market capability to make the sales that were diverted to the infringer, and (3) the amount of profit the patentee would have made from these diverted sales.  *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003).  "In essence, the two-supplier market test collapses the first two *Panduit* factors into one 'two suppliers in the relevant market' factor."  *Id.*

Cook's lost-profits analysis identifies former and prospective CellTrust customers that purchased services from ionLake, estimates the number of "user-months" ionLake sold services to each of those customers, calculates lost sales by multiplying the number of "user-months" by CellTrust's historical median revenue per "user-month" and deducts CellTrust's incremental costs for these allegedly lost sales.  Defendants argue that Cook failed to consider the availability of acceptable non-infringing alternatives, which is the second factor of the *Panduit* test and is implicitly part of the first factor in the two-supplier market test.  *Rite-Hite Corp.*, 56 F.3d at 1545; *Micro Chem.*, 318 F.3d at 1124.

CellTrust responds that it is not required to rely on the established *Panduit* or two-supplier market tests.  The Federal Circuit has recognized that, "[i]f there are other ways to show that the infringement in fact caused the patentee's lost profits, there is no reason why another test should not be acceptable."  *Rite-Hite Corp.*, 56 F.3d at 1548 (observing that "other fact situations may require different means of evaluation, and failure to meet the *Panduit* test does not *ipso facto* disqualify a loss from being compensable").  As such, a "patentee may resort to any method showing, with reasonable probability, entitlement to lost profits 'but for' the infringement."  *Micro Chem.*, 318 F.3d at 1122.  But the fact that a patentee may rely on other methods does not relieve the patentee of the burden to prove a causal relationship between the infringement and lost profits by establishing "that 'but for' the infringement, [the patentee] would have made the infringer's sales."  *BIC Leisure Prods.*, 1 F.3d at 1218.  As both the *Panduit* test and the two-supplier market test recognize, this causal relationship typically is satisfied by proving that no other person or

entity would have captured the patentee's lost sales.  *See id.*  As such, CellTrust necessarily must establish either that there were no other suppliers in the relevant market *or* that there were no alternative acceptable non-infringing products or services on the market.[13]

According to CellTrust, Cook's opinions satisfy this burden because he "weeded out sales that could have been made for acceptable substitutes by focusing solely on Defendants' sales to customers that overlapped with CellTrust's."  But this argument is logically flawed.  The fact that Cook focused on sales to customers that overlapped between CellTrust and ionLake does not necessarily demonstrate that those customers had no other market alternatives.

However, Cook's expert report also vaguely suggests that no other acceptable non-infringing alternatives are available on the market:

> Prior to CellTrust's patented SL2 product, there was no FINRA-compliant product for archiving SMS messages that was widely used and accepted in the financial services industry, and this continues to be the case today (excepting the companies who have recently introduced similar products that CellTrust believes likely infringe). As discussed in the

---

[13]    A patentee also could establish but-for causation as to lost profits by accounting for other competitors' market shares.  *See, e.g.*, *State Indus., Inc.*, 883 F.2d at 1578 (observing that "the absence of acceptable substitutes" on the market was "a neutral factor" because "all the other competitors [were credited] with their market shares").  Or a patentee could provide direct evidence from customers attesting that, if the infringing product or service were not available, those customers would have purchased the patentee's product or service.  *See, e.g.*, *Ziggity Sys., Inc. v. Val Watering Sys.*, 769 F. Supp. 752, 821 (E.D. Pa. 1990) (observing that "there is direct evidence of lost sales from customer testimony").  Cook does not purport to rely on any such evidence or analysis here.

> Factor 1 section, this situation effectively leaves ionLake
> without a product unless it licenses from CellTrust.

And in his reply report, Cook opines that "CellTrust was the first company to offer this solution," before which "there was no 'acceptable' . . . substitute product." Defendants correctly observe that Cook does not cite specific evidence to support these opinions. But Cook's report indicates that his opinions rely on his review of numerous documents and discussions with CellTrust employees, and CellTrust also relies on the declaration of its Chief Operating Officer and co-founder, Kevin Moshir, to support Cook's opinions about the absence of acceptable non-infringing alternatives.

An "expert is permitted to rely on facts, opinions, and data not of the expert's own making." *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015); *accord* Fed. R. Evid. 703. And disputes about the factual basis of an expert's testimony generally implicate credibility rather than admissibility. *See Sappington*, 512 F.3d at 450; *Minn. Supply Co.*, 472 F.3d at 544. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Although the factual basis underlying Cook's opinions about market alternatives is not robust, this deficiency impacts the weight and credibility of his opinions as opposed to their admissibility. Exclusion of Cook's expert opinions on this basis is unwarranted.

For these reasons, Defendants' motion to exclude Cook's opinions pertaining to lost-profits damages is denied.

2.        **Reasonable-Royalty Opinions**

Defendants also argue that Cook's opinions as to a reasonable royalty are arbitrary and unreliable.

As addressed above, if a patentee does not prove entitlement to lost profits, the patentee is entitled to reasonable-royalty damages, typically established based on a hypothetical negotiation.  *Unisplay*, 69 F.3d at 517.  The "hypothetical negotiation" is intended "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."  *VirnetX*, 767 F.3d at 1326 (internal quotation marks omitted).

Defendants first contend that Cook's opinions about a hypothetical negotiation are flawed because they are limited to the '012 Patent and do not include the '837 Patent. Cook's reasonable-royalty opinions pertain to "the date of first infringement . . . of the '012 patent on September 26, 2017."   Because the '837 Patent did not issue until September 2020, Defendants argue, Cook's reasonable-royalty opinions based on a September 2017 hypothetical negotiation cannot include damages pertaining to the '837 Patent.

"The key element in setting a reasonable royalty . . . is the necessity [to] return to the date when the infringement began."  *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 870 (Fed. Cir. 1993) (internal quotation marks omitted).  "The correct determination of this date is essential for properly assessing damages."  *Integra Lifesciences I, Ltd. v.*

*Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003), *vacated on other grounds* 545 U.S. 193 (2005).

However, "the hypothetical negotiation analysis permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333 (Fed. Cir. 2009) (internal quotation marks omitted). Courts have approved the use of a hypothetical negotiation date for multiple asserted patents based on the date when infringement first began, even if some of the asserted patents issued later, because "the resulting negotiation would include the fact that [some] of the patents issued later." *Comcast IP Holdings I LLC v. Sprint Commc'ns Co.*, 850 F.3d 1302, 1309 (Fed. Cir. 2017) (quoting *Comcast IP Holding I, LLC v. Sprint Commc'ns Co.*, No. 12-cv-0205-RGA, 2015 WL 4730899, at *9 (D. Del. Aug. 10, 2015)); *accord id.* at 1314 (observing that the jury was "told that the hypothetical negotiators would have employed the 'book of wisdom,' looking forward in time from the date of the first hypothetical negotiation to account for" all relevant information, including "the issuance of any later patent relating to the same technology"); *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, No. 2:15-CV-00037-RWS-RSP, 2017 WL 2651618, at *17 (E.D. Tex. June 20, 2017) (holding that defendant failed to adequately demonstrate why patentee's expert's "opinion that the parties would have engaged in a single hypothetical negotiation for both asserted patents is unreliable simply because [one of the asserted patents] had not yet issued"). This legal authority contradicts Defendants' argument, and Defendants

present no legal authority to the contrary. Exclusion of Cook's expert opinions on this basis is unwarranted.

Defendants next challenge Cook's reliance on CellTrust's reseller agreements, arguing that these agreements are not sufficiently comparable to the hypothetical license that the parties would have negotiated. The first *Georgia-Pacific* factor relevant to a establishing a reasonable royalty considers "[t]he royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." 318 F. Supp. at 1120. Cook acknowledges that CellTrust does not license its patented invention, but Cook relies on CellTrust's reseller agreements as "the closest analogue to what CellTrust as a licensor would be willing to offer in terms of pricing in a hypothetical license." Defendants' disagreement with the factual basis of this opinion implicates Cook's credibility rather than admissibility, however. *See Sappington*, 512 F.3d at 450; *Minn. Supply Co.*, 472 F.3d at 544. Indeed, Cook acknowledges that the reseller agreements are not equivalent to a license agreement, but instead are merely close analogues to a license agreement. Defendants will have an opportunity to challenge this comparison through cross-examination and the presentation of contrary evidence. As such, exclusion of Cook's expert opinions on this basis is unwarranted.

Defendants also argue that Cook failed to meaningfully analyze the thirteenth *Georgia-Pacific* factor, which pertains to the "portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by

the infringer." 318 F. Supp. at 1120.  Notably, the Federal Circuit has recognized that the *Georgia-Pacific* factors are "comprehensive (but unprioritized and often overlapping)." *ResQNet.com, Inc.*, 594 F.3d at 869.  Courts "do not require that witnesses use any or all of the *Georgia-Pacific* factors when testifying about damages in patent cases." *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012).  And failing to consider every relevant *Georgia-Pacific* factor is distinct from presenting weak evidence in support of a *Georgia-Pacific* factor, because the latter circumstance tends to implicate weight and credibility.  *Cf. Wallace Comput. Servs., Inc. v. Uarco Inc.*, 887 F.2d 1095, 1 (Fed. Cir. 1989) (table decision).

Here, Cook's expert report reflects that he expressly considered the thirteenth *Georgia-Pacific* factor as well as related overlapping factors, such as the utility and advantages of the patented invention.  Although Cook's opinion as to the thirteenth *Georgia-Pacific* factor is brief, he cites record evidence to support this opinion. Moreover, Cook applied a downward adjustment in his reasonable-royalty calculation based on this factor, which favors Defendants.  Defendants' disagreement with these aspects of Cook's opinions implicates Cook's credibility rather than admissibility.  *See Sappington*, 512 F.3d at 450; *Minn. Supply Co.*, 472 F.3d at 544.  Any purported flaws in Cook's analysis can be addressed through cross-examination and the presentation of contrary evidence.  As such, exclusion of Cook's expert opinions on this basis is unwarranted.

For these reasons, Defendants' motion to exclude Cook's opinions pertaining to reasonable-royalty damages is denied.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein,

**IT IS HEREBY ORDERED**:

1.      The disputed claim terms in United States Patent Nos. 9,775,012 and 10,778,837 are construed as addressed herein.

2.      Plaintiff CellTrust Corporation's motion for partial summary judgment as to invalidity, (Dkt. 191), is **GRANTED IN PART** on all bases except obviousness, as addressed herein.

3.      Defendants ionLake, LLC, Derrick Girard and Wade Girard's motion for summary judgment, (Dkt. 200), is **DENIED**.

4.      Plaintiff CellTrust Corporation's motion to exclude expert testimony, (Dkt. 175), is **GRANTED IN PART AND DENIED IN PART** as follows:

       a.  Plaintiff CellTrust Corporation's motion to exclude expert testimony is **GRANTED** as to Defendants' patent expert and any of Defendants' technical expert's noninfringement opinions that are contrary to the Court's claim construction, as addressed herein; and

       b.  Plaintiff CellTrust Corporation's motion to exclude expert testimony is **DENIED** as to Defendants' technical expert and damages expert in all other respects.

5.       Defendants ionLake, LLC, Derrick Girard and Wade Girard's motion to exclude expert testimony, (Dkt. 156), is **DENIED**.


Dated:  September 2, 2022                              s/Wilhelmina M. Wright
                                                      Wilhelmina M. Wright
                                                      United States District Judge